MICHAELIS v. NANCE et al. (No. 5590.)*

(Court of Civil Appeals of Texas. Austin. March 2, 1916. On Motion for Rehearing April 12, 1916.)

1. WILLS &#x25C8;&#x2192;423—PROBATE—EFFECT.
    Under Rev. St. 1911, § 3248, limiting the time for probating wills, the probate of a will at the instance of one not in default under that statute inures to the benefit of all of the heirs.
    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 911–913; Dec. Dig. &#x25C8;&#x2192;423.]

2. WILLS &#x25C8;&#x2192;324(1)—LIMITATIONS—IGNORANCE —COMPUTATION OF PERIOD—IN DEFAULT.
    Under Rev. St. 1911, § 3248, limiting the time for probating wills, evidence that delay in discovering and offering for probate a holographic will was due to intrusting possession of testator's papers to another of his children *held* not insufficient as a matter of law to prove that the proponent was not in default.
    [Ed. Note.—For other cases, see Wills, Cent. Dig. § 767; Dec. Dig. &#x25C8;&#x2192;324(1).]

3. PRINCIPAL AND AGENT &#x25C8;&#x2192;178(1)—NOTICE TO AGENT—SCOPE OF AGENCY.
    The knowledge of one performing a mere ministerial duty is not imputed to his principal.
    [Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 680, 683, 683½; Dec. Dig. &#x25C8;&#x2192;178(1).]

4. NOTICE &#x25C8;&#x2192;5—TO AGENT—SCOPE OF AGENCY.
    The knowledge of the contents of papers by one given physical custody thereof does not affect the person depositing the papers.
    [Ed. Note.—For other cases, see Notice, Cent. Dig. §§ 3, 8–12; Dec. Dig. &#x25C8;&#x2192;5.]

Appeal from District Court, Hays County; Frank S. Roberts, Judge.

Proceeding by Mrs. Bassie Nance and others to probate a will. From judgment probating the will, defendant M. G. Michaelis appeals. Affirmed.

R. E. McKie, of San Marcos, and Henne & Fuchs, of New Braunfels, for appellant. O. T. Brown and Barber & Johnson, all of San Marcos, for appellees.

### Findings of Fact.

JENKINS, J. W. W. Haupt died at his residence in Hays county, Tex., on the 27th day of August, 1907, leaving surviving him his wife, Sarah A. Haupt, and six children, to wit: Mrs. A. B. Landers, wife of A. P. Land-

&#x25C8;&#x2192;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

184 S.W.—50   *Application for writ of error pending in Supreme Court.

ers; Mrs. Lelia Cooper, a widow; Mrs. Bassie Nance, wife of J. M. Nance; G. B. Haupt; L. M. Haupt; and Mrs. Touay Barbee, wife of W. H. Barbee. He left an instrument in his own handwriting claimed to be his last will and testament. His wife died September 1, 1912. Upon the death of W. W. Haupt his son, Louis Haupt, who had been attending to his business for some years, took charge, with the consent of all of the heirs, of all of his property, including his private papers. His property consisted of pasture lands which Louis Haupt leased and applied the proceeds to the support of the wife of W. W. Haupt during her lifetime, and it is to be inferred from the record that thereafter he divided such proceeds among the surviving children, except Mrs. Landers. Mrs. Landers at the time of the death of W. W. Haupt, and for some years prior thereto, had been insane, and had made her home with her father, though she had a husband and two sons living at Sulphur Springs, in Hopkins county, Tex. Prior to his death W. W. Haupt divided his farm lands, except 125 acres, equally among his five children, not including Mrs. Landers. There were 125 acres of this land which the evidence shows that W. W. Haupt had expressed an intention of dividing prior to his death in like manner as he had divided his other lands, but this was not done. The instrument purporting to be the will of W. W. Haupt was signed by him, but not witnessed by any one. Louis Haupt supposed that the same was invalid as a will for the reason that it was not witnessed. The other four children, and also the son of Mrs. Landers, knew of the existence of this writing, but none of them ever saw it until about March 20, 1914, when it was seen by J. M. Nance, the husband of Mrs. Nance, who took it to San Marcos, submitted it to a lawyer, and was informed that it was a valid will. On the following day it was offered for probate. The will provided that the lands referred to should become the property of the five children, excluding Mrs. Landers. All of the children of W. W. Haupt, except Mrs. Landers, resided in Hays county. Shortly after the death of W. W. Haupt it was thought advisable to send Mrs. Landers to a sanitarium at San Antonio. The remaining children, supposing that their father had died intestate, and that Mrs. Landers had an interest in the estate, sold the 125 acres above referred to for $1,000, and appropriated that money to the use and benefit of Mrs. Landers. Appellant had bargained with Mrs. A. P. Landers, the husband and guardian of Mrs. Landers, for the purchase of her one-sixth interest in the land. He afterwards completed his purchase from Landers, who executed to him a deed for such interest by order of the probate court of Hopkins county. Appellant resisted the probate of the alleged will in the county court, and upon the same being

there probated he appealed to the district court, where a like judgment was rendered, from which judgment this appeal is prosecuted.

### Opinion.

[1] It will be seen from the foregoing findings of fact that the will of W. W. Haupt was not offered for probate until about seven years after his death, for which reason, appellant contends, that the probate of said will was barred by the statute of limitation under article 3248 of the Revised Statutes, which prescribes that wills shall not be admitted to probate after a lapse of four years after the death of the testator, except where the party offering the same is not in default. Appellee contends that article 3248, supra, is essentially a statute of limitation, and therefore, by virtue of article 5708, does not apply to married women. Mrs. Nance and Mrs. Barbee were married at the date of their father's death, and continued so to be up to the time of the trial hereof. We deem it unnecessary to pass upon this issue, inasmuch as this judgment, we think, ought to be affirmed upon the ground that Mrs. Barbee, at least, was not in default in not sooner offering the will for probate; and, if not, the probate of the will at her instance inures to the benefit of all of the heirs of W. W. Haupt. Masterson v. Harris (Sup.) 174 S. W. 570. The case was submitted in the district court upon special issues as follows:

"Special Issue No. 1. If instrument offered for probate was, in fact, written and signed by William W. Haupt, did he intend it for and as his will, that is, did he intend thereby to express and direct the disposition to be made of all or any of his property after his death? You will answer this question 'Yes,' or 'No,' on the following form of verdict. Ans. Yes.

"Section No. 1. For your guidance in making your findings upon issues Nos. 2, 3, 4, 5, and 6 you are instructed by the court that the laws of Texas provide that: 'No will shall be admitted to probate after the lapse of four years from the death of the testator, unless it be shown by proof that the party applying for such probate was not in default in failing to present the same for probate within the four years.' The undisputed evidence in this case shows that each of the parties offering the alleged will for probate knew, within less than four years next after the death of William W. Haupt, that he had either written or started to write some character of instrument with reference to his estate and the disposition to be made thereof after his death. Now, you are directed by the court that it was the duty of each of the interested parties who now offer said instrument for probate to exercise due care to know the nature and effect of such paper; and, if by the exercise of such care he or she would have ascertained the true character of the paper in question in time to have offered same for probate within four years after the death of William W. Haupt, then, under such circumstances, he or she would be in default in not offering same for probate within that time. (a) The expression 'due care,' as used herein, means that degree of care which a person of ordinary prudence would have exercised under the same or similar circumstances.

"Section No. 2. If under all the facts and circumstances in evidence you find that any party or parties now offering the said instrument for

probate did exercise due care and did not, in fact, ascertain or know the true condition of the paper in question at any time within four years next succeeding the death of William W. Haupt, then you will be authorized to find that such party or parties was not in default. Bearing in mind the foregoing instructions, you will answer each of the following questions or issues Nos. 2, 3, 4, 5, and 6:

"Special Issue No. 2. Was W. H. Barbee in default in not offering the instrument in question for probate within four years next after the death of W. W. Haupt? Ans. No.

"Special Issue No. 3. Was Mrs. Touay Barbee in default in not offering the instrument in question for probate within four years after the death of W. W. Haupt? Ans. No.

"Special Issue No. 4. Was G. B. Haupt in default in not offering the instrument in question for probate within four years next after the death of W. W. Haupt? Ans. No.

"Special Issue No. 5. Was J. M. Nance in default in not offering the instrument in question for probate within four years next after the death of W. W. Haupt? Ans. No.

"Special Issue No. 6. Was Mrs. Bassie Nance in default in not offering the instrument in question for probate within four years next after the death of W. W. Haupt? Ans. No."

We need consider only special issues Nos. 2 and 3, relating to Mrs. Barbee and her husband. The testimony which we think is sufficient to sustain the judgment of the court as to Mrs. Barbee and her husband is as follows:

W. H. Barbee testified:

"After the death of Mr. Haupt I understood that he had started a will. My wife told me that he had left a paper or will, something of the kind. She did not know exactly what it was. This was soon after Mr. Haupt's death. I did not know but what it was a will. I asked Louis [L. M. Haupt], and he told me that he had started a will, but had never completed it, and that it was not signed. He told me about what he had in it. It was some time within a year after Mr. Haupt died. From what Louis told me I just supposed he had started a writing, but had never completed it, and had never signed it at all, and I didn't give it any more thought. I thought it was worthless. If Louis had told me that Mr. Haupt had written out and signed a paper, I would have insisted on having it probated, because I understood that was legal. When Louis Haupt told me that, I did not have any reason to question his statement. I took his word for it. I did not ascertain anything to the contrary until the Sunday before it was brought down here, which was in February or March. * * * My understanding was that Louis was taking charge of the property, and everything in the house was left, and nobody lived in the house. Between the death of Mr. Haupt and that of Mrs. Haupt the only income they had was from the rent of the pastures. Mr. Haupt had kept them rented out. Several years before he died he had sold all his stock. Louis attended to this, and after Mr. Haupt's death he would collect the earnings and place that money in the bank to Mrs. Haupt's credit, and she would check it out at her will. * * * Subsequent to the death of Mr. Haupt the children executed a deed by which they conveyed part of the land that had belonged to the estate, which deed recited that he died without any will. * * * I think it was 125 acres. Before Mr. Haupt's death there had never been any division as between the children of that 125 acres of land."

He then states that this 125 acres was sold to secure funds for the support of Mrs. Landers, and also that the deed to this 125 acres was drawn by Mr. Barber, attorney for appellee in this case, and that at the time the deed was drawn Mr. Barber asked if Mr. Haupt had left a will, and that Louis Haupt then made the statement to him substantially as he had previously made it to the witness, namely, that Mr. Haupt had begun a writing with reference to his property, but had not finished it, and that it was not signed. The witness stated that he had no other information in regard to this instrument until the Sunday before it was offered for probate on Monday (March 21, 1914), at which time he and his wife were at the house of Mr. Nance; that he was discussing with Mr. Nance the offer of appellant to purchase the undivided interest of Mrs. Landers, and that he stated that he wished Mr. Haupt had signed the instrument that he had written, so that the members of the family could control the land, and not let an outside party in. Mr. Nance then stated to him that the instrument was signed, but was of no value as a will because it was not witnessed. The witness then said that, if Mr. Haupt wrote the instrument and signed it, it could be probated as a will. Thereupon they went to church, where Louis Haupt was, and took him aside, and the witness asked Louis if the instrument referred to had been signed by Mr. Haupt, and Louis answered that it had, but was not witnessed. He then stated that it was his understanding in such cases witnesses were not required. On the next day Mr. Nance went to the house of Louis Haupt, got the instrument, took it to San Marcos, and submitted it to Mr. Brown, a lawyer there, who advised that it be offered for probate, which was accordingly done. On cross-examination the witness said:

"I knew all the time from a short time after Col. Haupt's death that he had left an instrument of some kind in the form of a will or something that purported to be a portion of a will or something of that sort. I never did request to see the paper. Louis told me that it was not signed, and I did not think it was necessary. * * * I did not think that Louis Haupt intentionally made a false statement to me about it. As well as I recollect, he did not tell me that the will was not signed up properly, but he said the will was not signed; that is what he told me as well as I recollect. I am certain that that is what he told me at the time."

Referring to the sale of the 125 acres, the proceeds of which were used for Mrs. Landers' benefit, the witness said:

"I guess I did recognize the fact that Mrs. Landers was entitled to a share in the property that was being divided. We did not think there was any will, and, of course, we thought she was entitled to it. * * * At that time we were raising money to send her to San Antonio for treatment."

Referring to the conversation in the office of Mr. Barber at the time the deed to the 125 acres of land was made, witness said:

"I never requested Mr. Barber to look at it [the will] and tell me what it was. I did not consider it worth looking at, if it was not completed. I never requested any lawyer at any

time to examine it until it was brought down here to Mr. Brown about a year ago. I considered that if it had no signature that it was worthless; that it was just as if it was not made. I am not a lawyer."

On redirect examination the witness said:

"There was nothing at all to cause me to suspect or surmise that Louis was incorrectly stating the situation to me when he told me the paper was not signed. I had absolute confidence in him. * * * I do not know that I ever talked with Mr. Nance about it before until after I heard that Michaelis had contracted to buy Mrs. Landers' interest. I just in talking in a general conversation said that I was sorry that Mr. Haupt had not completed the will and signed it up, so we could protect Mrs. Landers, and also ourselves, and keep out undesirable persons. * * * I don't think I ever mentioned it to any of the other heirs."

Mrs. Touay Barbee testified as follows:

"Before my father's death my mother told me he had started a writing. She said it was for us children to go by after their death. I never saw any paper that my father had prepared. After he died Louis said that it was a paper, but that it was of no value, because it was not signed. This must have been some months after my father died; I don't remember exactly. I probably may have told my husband that some time there was a writing, but that was all. We did not discuss it. After Louis told me that I never had any information subsequent to that until the matter came up recently advising me that the paper, whatever it was, was actually signed by my father. If at any time after my father's death Louis had told me that there was a paper written out and signed by my father, I would have consulted my husband, and gone by his wishes; he is the business member of the firm. * * * Up until that Sunday night when we were at Mrs. Nance's house I had no information that caused me to think or surmise that this paper was actually written out, completed, and signed by my father. All of that time I had believed that it was not, in fact, signed by my father. * * * From the first I didn't think the will was finished. The idea I conceived was that it was not a finished will. My mother first told me about this paper being in existence. Louis was the first one told me about it not being signed up properly. * * * My mother did not tell me the paper was not signed. Louis told me shortly after Papa's death that it was not signed. That was seven years ago. I may not repeat his exact words, but he said that Papa left a writing, but it was not signed, and it was of no value. * * * I knew there was a writing started for us to go by, but I never knew that it was finished or signed. * * * Louis Haupt is my brother. I knew him to be an honest man, and I knew that he would not make away with anything. He would not do anything wrong intentionally. If he misled us, it was by ignorance or mistake."

The witness stated that she knew her father's wishes with reference to his property by talking with him about it, and that she supposed his wishes were being carried out. "He frequently expressed his wishes in regard to the Landers people." The will of Mr. Haupt states that he does not wish Landers or his sons to have any of his land, but undertakes to make an equal division of it among the other children after the death of his wife.

[2] Appellant cites in support of his contention that the testimony shows, as matter of law, that Mrs. Barbee, as well as the others, was in default within the meaning of the statute. Boren v. Boren, 38 Tex. Civ. App. 139, 85 S. W. 48; Stanford v. Finks, 45 Tex. Civ. App. 30, 99 S. W. 449; Kuhlman v. Baker, 50 Tex. 631; Connoly v. Hammond, 58 Tex. 16; Calhoun v. Burton, 64 Tex. 518; Bass v. James, 83 Tex. 110, 18 S. W. 336; Smith v. Fly, 24 Tex. 345, 76 Am. Dec. 109; Hudson v. Wheeler, 34 Tex. 366; and several other cases not stronger than the ones stated. In Boren v. Boren and Stanford v. Finks, supra, in which cases it was held that negligence was shown as matter of law, the facts in the cases were shown by public records. In the first case a will had been made devising the life estate in land to the mother of appellant, who was then 15 years old, with remainder to him. The will was duly probated. He alleged that his elder brother procured him to sign a deed to the land with his mother, upon the representation that he had no interest in the land, but that his signature was necessary in order to obtain a loan. Eleven years afterwards he brought suit to set aside the probate of the will. A demurrer to his petition was sustained. The court said that it was not shown that appellant was not of average intelligence, although it was alleged that he could not read or write; that every boy of average intelligence 15 years of age ought to be presumed to know that he had some interest in land belonging to his deceased father, unless his father had disposed of it by will. If he had gone to the records, he could have ascertained that there was a will, and that he was the legatee thereunder. This he did not do until after he was 23 years of age.

In the case of Stanford v. Finks, supra, there was a judgment against the party of which he had knowledge, and it was held that he should be required to take notice as to how he was affected by the judgment.

In Bass v. James and Smith v. Fly, supra, suit was brought to recover for a deficiency in acreage, not upon a warranty, but upon the ground of misrepresentation. In the first case the suit was brought within three years after the purchase of the land. In the second case the deed was made December 29, 1853, and the suit was filed April 1, 1859. In these cases it was held negligence, as matter of law, for a man to fail for the length of time shown to ascertain the quantity of land in a tract owned by him, as he could easily have done by having a survey made.

In Kuhlman v. Baker, supra, the allegation was that Baker had represented to Kuhlman that he had a good title to a tract of land, and was making him a warranty deed. The deed was made in 1856. Kuhlman alleged that suit had been brought, and that he had been evicted from the land, and that he did not discover that Baker did not have a good title, nor that his deed was not a warranty until such suit was filed 17 years after the deed was executed. In addition to what was said as to the duty of a party to know under

what kind of a deed he holds title to land, the court said that it did not appear that confidential relations continued to exist between the parties after the execution of the deed.

In Hudson v. Wheeler, supra, an attempt was made to set aside two deeds, duly recorded, and under which the land had been held, one for the period of 17 years, and the other for 25 years. On the other hand, it was held in Pitman v. Holmes, 34 Tex. Civ. App. 485, 78 S. W. 961, that the fact that land that was purchased with the separate money of plaintiff's father was misrepresented to plaintiff and concealed from her by her mother was sufficient to suspend the running of the statute of limitation until her discovery of such fraud, 17 years thereafter.

In Isaacks v. Wright, 50 Tex. Civ. App. 312, 110 S. W. 970, it was held that failure to discover that the wrong lots were pointed out to the purchaser suspended the statute of limitation for a period of more than 4 years. In Shuttleworth v. McGee, 47 Tex. Civ. App. 604, 105 S. W. 823, an attorney employed to collect a note reported to his client, a nonresident, that he had obtained judgment thereon, and subsequently by letter confirmed this statement. This was in 1902. In 1906 the owner of said note heard of the death of his said attorney, and employed another attorney to attend to the collection of said judgment. The latter attorney informed the plaintiff that no judgment had been obtained, and thereupon he instituted suit upon said note. The court, among other things, said:

"Under the facts as set up in the petition, which the demurrers admit to be true, the trial court erred in holding that the plaintiff's cause of action was barred by the four-year statute of limitation; and, if the two-year statute applied to plaintiff's cause of action, still we think the statute was suspended by the misrepresentation of Pope [the deceased attorney] to his client."

In Cooper v. Lee, 1 Tex. Civ. App. 9, 21 S. W. 998, Lee brought suit to set aside a deed which he alleged he had been induced to execute upon the fraudulent representation of the defendant, who was his son-in-law and legal adviser. It was held that this was sufficient to raise the issue as to reasonable diligence in bringing the suit. See, also, Ryan v. Railway Co., 64 Tex. 239; Ochoa v. Miller, 59 Tex. 462; Elwell v. Convention, 76 Tex. 519, 13 S. W. 552; St. Mary's Asylum v. Masterson, 57 Tex. Civ. App. 646, 122 S. W. 587; Pena v. Bruni, 156 S. W. 315; Brown v. Brown, 61 Tex. 56. In St. Mary's Asylum v. Masterson, supra, the will was not offered for probate until 21 years after the death of the testator, but it was held under the facts of that case that proponent was not in default within the meaning of the statute.

The issue in the instant case, as it is in cases where fraud or concealment of material facts is alleged, is as to whether the party deceived or misled has used reasonable diligence to discover the fraud or mistake. The court submitted this issue upon a correct definition as to diligence, and the jury found in favor of appellee on the issue submitted. As above stated, we think the evidence was sufficient to raise the issue, and that the court did not err in refusing to peremptorily instruct the jury to find for appellant, and did not err in refusing to grant appellant a new trial on the ground that the verdict of the jury was unsupported by the evidence.

Appellant assigns error upon the action of the court in overruling the special exception to the petition; his proposition being that the general allegations contained in the pleading of proponents that they acted with proper diligence, and that through no fault of theirs was the will not sooner propounded for probate, are conclusions, and are wholly insufficient to excuse such default. The petition not only stated the legal conclusion from the facts relied upon, but also stated such facts. Hence we hold that the court did not err in overruling the special exception referred to.

Appellant assigns error as to the judgment rendered, for the reason that it does not appear from the record that the witnesses by whom the will was proven up subscribed to their testimony in either the county court or in the district court. As to the proceedings in the county court, it is immaterial whether or not the witnesses subscribed to their testimony, inasmuch as the trial in the district court is de novo. As to the proceedings in the district court, it does not appear from the record whether or not the witnesses subscribed to their testimony, but we think that is immaterial. The issue presented on this appeal is as to whether or not the testimony of such witnesses is sufficient to sustain the verdict of the jury. This testimony is before us upon an agreed statement of facts, and to that alone we look in determining the issue here presented.

Appellant assigns error upon the action of the court in refusing to submit to the jury special issue No. 6 requested by contestant. Said issue was as to whether or not Louis M. Haupt was the agent of the respective proponents for the purpose of caring for and having custody of the papers left by W. W. Haupt at the time of his death. The court refused to submit this issue. The testimony in support of this issue, as stated in appellant's brief, is as follows:

The witness Mrs. Bassie Nance testified that Louis Haupt took charge of his father's affairs after his death; that she did not know whether Louis was acting for all of the proponents in taking charge of her father's papers or not.

J. M. Nance testified:

"Mr. Haupt had Louis Haupt looking after his business affairs for several years before his death. He was getting tolerably old. Louis lived there with him until he married, and then he moved to Kyle, but attended to his father's

business at the time he was living there with him. Louis took charge of the old man's affairs after his death, or it seems it turned out that way. I did not ask him, but I supposed he was looking after the property in the interest of all the heirs. I offered no objection to it."

W. H. Barbee testified:

"My understanding was that Louis Haupt was taking charge of the property, and everything in the house was left, and nobody lived in the house. I supposed Louis Haupt had the papers, as he attended to all his father's business for him, and in the discussion in Mr. Barber's office I think I knew that Louis had possession of it. In fact, I think that Louis took charge of all the papers of Mr. Haupt's estate after Mrs. Haupt broke up housekeeping. I think he took all the papers down to Kyle, and probably put them in the bank, but I am not sure. That, however, is my understanding. I never objected at all to Louis having possession of these papers."

Mrs. Touay Barbee testified:

"Louis did not take charge of the management of the papers and other property of my father's estate for my mother and the other children, only in this way: He said to me, and probably to my husband: 'Some one has got to take the lead and settle off the funeral expenses of our mother and the estate, and will it be all right for me to give out the checks?' I told him so far as I was concerned it was all right. There was no other lead to take. I knew that Louis had all the papers of my father's estate, and I didn't make any objection to his retaining possession of them. I thought, as he had been with father and attended to his things, he was the proper one."

G. B. Haupt testified:

"I told him [Louis] at the time: 'You had better get all of his papers and put them somewhere where they are not liable to get burned up.' I might have said: 'We had better get them papers.' I left it to him, as he knew where they were, which part of the desk they were in. He had been attending to that, and I knew he would get them all."

Louis Haupt testified:

"I took all of his papers. I knew where he kept his deeds and private papers. It is not a fact that shortly after my father's death I took charge of all my father's papers with the consent of my brothers and sisters. I supposed they all knew I had these papers. There was no objection raised to my taking them. None of them ever came to me and demanded any of these papers. If they had demanded it, I would have let them look at the papers. I did not feel that I had any more right than they did, only they were in my possession."

In addition to the above, W. H. Barbee testified:

"I did not understand that Louis was caring for the papers for the benefit of all the heirs, but for Mrs. Haupt."

[3] This testimony, at most, shows that Louis M. Haupt took the physical custody of the papers belonging to his father's estate, including the will, with the knowledge of the other heirs, and without objection on their part. The contention of appellant is that Louis Haupt was the agent of the other heirs, and that his knowledge that the will was written and signed by the deceased is to be imputed to the other heirs. It is true that, under proper restrictions, knowledge acquired by an agent will be imputed to the princi-

pal, but this is true only where the agent acquires such knowledge while in performance of the principal's business, and while acting with reference to the matter for which his agency was created. Where one in performing a mere ministerial duty learns facts material if known to his principal, there is no imputation of such knowledge as to the principal. Labbe v. Corbett, 69 Tex. 503, 6 S. W. 808; Storms v. Mundy, 46 Tex. Civ. App. 88, 101 S. W. 258; Pennoyer v. Willis, 26 Or. 1, 36 Pac. 568, 46 Am. St. Rep. 595; Mechem on Agency (2d Ed.) §§ 1831–1834; 39 Cyc. pp. 1587, 1595.

In Labbe v. Corbett, supra, the issue was as to whether Labbe knew of the diseased condition of certain sheep. In receiving the sheep he had with him persons to assist in taking charge and driving the sheep, and these parties observed at the time that the sheep were diseased. Under this state of facts the court said:

"If it had been shown that appellant had an agent or agents to whom he had intrusted the duty of ascertaining the condition of the sheep, then such a charge as was given would have been correct; for in such case the making of inquiry would have been within the scope of the agent's power, and it would have been his duty to communicate to his principal the knowledge possessed by himself. The facts, however, do not show any such agency, but do show that the appellant was present to examine the sheep for himself, and that he had persons with him whose sole duty it was to assist him in driving and caring for the sheep. Some of these persons stated that they saw some diseased sheep at the time they were delivered. The knowledge of persons so situated could not be deemed to affect the appellant with knowledge of the facts known to them."

[4] There is no testimony in this case tending to show that Louis Haupt was the agent of the other heirs for the purpose of ascertaining the contents of the will, or as to whether or not it was signed or properly signed. The mere fact that, with the consent of the other heirs, or even at their request, he took charge of the papers, including this will, for safe-keeping, would not affect the others with knowledge which he may have acquired from an examination of this paper.

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.

## On Motion for Rehearing.

Appellant in his motion for rehearing complains that we in our opinion herein construed the will of W. W. Haupt as providing that "the lands referred to should become the property of the five children, excluding Mrs. Landers." We had no intention of construing the will, as that was not an issue before us, and what we said in reference thereto is, of course, dicta.

All the grounds set out in the motion for rehearing have been carefully examined, and we overrule the same.

Motion overruled.